UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARRY W. MATLOCK,

    Plaintiff,

    v.                           CAUSE NO.: 3:18-CV-1007-JD-MGG

PORTER, et al.,

    Defendants.

## AMENDED OPINION AND ORDER[1]

Barry W. Matlock, a prisoner without a lawyer, filed a motion (ECF 48) seeking leave to amend his complaint a third time. The proposed third amended complaint seeks to add additional claims and defendants. As with his earlier complaints, Matlock alleges that Sgt. Porter[2] made racially derogatory comments, he complained about Sgt. Porter's behavior, and he was retaliated against for making complaints and filing this lawsuit by various other members of the staff at Westville Correctional Facility. The motion will be granted, and the clerk will be instructed to file the third amended complaint.

A filing by an unrepresented party "is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

---

[1] This order is amended to include a directive that Sgt. Espisito be served.

[2] Officer Porter was promoted to sergeant after this case was initiated. Her new title is used throughout this order for consistency.

(quotation marks and citations omitted). Nevertheless, pursuant to 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

In his third amended complaint, Matlock again alleges that Sgt. Porter made racially derogatory comments to him, and he complained about her conduct. Under the Eighth Amendment, prisoners cannot be subjected to cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). "An Eighth Amendment claim based on the infliction of psychological pain on an inmate requires (1) objectively, sufficiently serious misconduct, and, (2) subjectively, an intent to wantonly inflict psychological pain for no legitimate purpose." *Snow v. List*, No. 11-CV-3411, 2014 WL 1515613 * 1 (C.D. Ill. April 17, 2014)(*citing Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003)). Standing alone, "[t]he use of derogatory language, while unprofessional and deplorable," is not serious enough to violate the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). While indeed offensive behavior, Sgt. Porter's derogatory comments do not, by themselves, implicate the Eighth Amendment, and Matlock will not be permitted to proceed on this claim.

After Matlock filed complaints about Sgt. Porter's behavior, Mr. Sonnenberg moved Matlock from his two-man cell to a four-man cell. Matlock found this distressing because he suffers from Post-Traumatic Stress Disorder and this transfer was contrary to the recommendation of a mental health worker that he not be placed in a cell with more than one other individual. Furthermore, Mr. Sonnenberg, Warden Sevier, and Rob

2

Wright had him removed from his job with Pen Products. Additionally, Wright wrote Matlock up for refusing a work assignment even though he explained that his refusal was based on threats to harm him by the Vice Lords if he did show up for work. He believes these actions were motivated by retaliation for complaining about Sgt. Porter. "To prevail on his First Amendment retaliation claim, [Matlock] must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (quotation marks and citations omitted). Here, while Matlock's allegations are sparse, he will be permitted to proceed on his retaliation claims against Mr. Sonnenberg, Warden Sevier, and Rob Wright in their individual capacities for nominal, compensatory, and punitive damages, and in their official capacities for injunctive relief.

Matlock also alleges that several defendants threatened him because he complained about Sgt. Porter. The following allegations are nearly identical to those in his earlier complaints. On November 7, 2018, Sgt. Franklin told Matlock that he heard that Matlock was messing with his friend Sgt. Porter, that he did not like for people to mess with his friends, and that "Westville can be a dangerous place and bad things can happen to people like Matlock." (ECF 48-1 at 3-4.) On November 10, 2018, Sgt. Flakes referenced the complaint Matlock filed against Sgt. Porter and indicated that she "has friends who are Vice Lords and they know how to deal with people like Matlock." (*Id.*

3

at 4.) On November 14, 2018, Sgt. Motshagen[3] indicated that she heard that Matlock was causing trouble by filing complaints against staff, and she indicated that "it would be a shame if Matlock needed help" and Sgt. Motshagen or other staff turned their backs and "let harm come to Matlock." (*Id*.) On November 17, 2018, Lt. Yancey reminded Matlock of a brutal attack on inmates at Indiana State Prison, and he said, "that's what happens to inmates who mess with his brothers and sisters in blue." (*Id*.) On November 26, 2018, Sgt. Collier indicated that he "would make Matlock pay dearly" if he did not stop messing with Sgt. Porter. (*Id*.) He further indicated that he has family that are Vice Lords, and "he could and would put them on Matlock." (*Id.* at 5.) These allegations state a claim of retaliation against Sgt. Collier, Sgt. Flakes, Lt. Yancey, Sgt. Motshagen, and Sgt. Franklin. Therefore, he will be permitted to proceed against these defendants in their individual capacities for nominal, compensatory, and punitive damages and in their official capacities for injunctive relief.

Matlock also alleges that Sgt. Porter has been directly involved in the retaliation against him. On February 26, 2019, Sgt. Porter directed other officers to shake down Matlock's cell, then asked him how he liked the shake down and told him that "it ain't over white boy" and that there is more to come. (*Id.* at 6.) On March 3, 2019, Sgt. Porter told Matlock to watch his cell because "it would be hell if a weapon or drugs were found [there]." (*Id.*) On March 7, 2019, Sgt. Porter again threatened to have Matlock's cell shook down. And, Sgt. Porter told Matlock that he was lucky he did not make it to

---

[3] While the third amended complaint names Sgt. Mottshagan as a defendant, it appears that the correct spelling of this name is "Motshagen." (ECF 16.)

4

commissary "as it would've been a shame had he been robbed" because Sgt. Porter would'nt [sic] have seen a thing." (*Id.*) She tried to involve other prisoners in her dispute with Matlock on more than one occasion (although it is unclear if she was successful). Sgt. Porter told another officer not to hang around Matlock because, if he did, he would find an enemy in her. On March 16, 2019, several inmates complained about small portions on their lunch trays, including Matlock. Sgt. Porter provided a second lunch sack to each inmate that had complained - except Matlock. When Matlock asked Sgt. Porter for a sack, she said, "me give you a sack[. R]eally get real." (*Id.* at 7.) While some of the alleged deprivations that Matlock suffered are not sufficiently serious to state a claim, together they suggest retaliatory motive. And, both threats of disciplinary complaints that could lengthen Matlock's confinement and the risks associated with inciting other prisoners to participate in her campaign against Matlock are enough to deter future First Amendment activity in a person of reasonable firmness. Matlock has stated a claim of retaliation against Sgt. Porter, and Matlock will be permitted to proceed against her in her individual capacity for nominal, compensatory, and punitive damages and in her official capacity for injunctive relief. However, for the reasons explained in this court's earlier screening order (ECF 39), Sgt. Porter's actions are not sufficiently severe to implicate the Eighth Amendment

Matlock also alleges that Warden Sevier retaliated against him by conspiring with Patrick Krueger to deny Matlock's request for a hardship transfer. On February 15, 2019, Caseworker Shawna Brown told Matlock that she would submit a hardship transfer for Matlock, but that he should not get his hopes up because Warden Sevier

was going to have Patrick Krueger deny the motion to "piss Matlock off" because he had filed grievances, lawsuits, and a complaint under the Prison Rape Elimination Act. (ECF 48-1 at 7.) Krueger denied the request on March 5, 2019. These allegations state a claim of retaliation against Warden Sevier and Patrick Krueger, and Matlock will be permitted to proceed against them in their individual capacities for nominal, compensatory, and punitive damages and in their official capacities for injunctive relief.

Following the denial of his hardship transfer, on April 16, 2019, Matlock was threatened by Hoskins, an inmate serving as a dorm representative. Hoskins had a homemade weapon that appeared to be razor blades attached to a toothbrush. Hoskins threatened to slit Matlock's throat if he "kept up his bullshit causing trouble with staff making it hot on the dorm and such." (*Id.* at 7-8.) Matlock told Sgt. Deu about the threat, and Sgt. Deu said he would take care of it. A couple of hours later, Matlock approached Sgt. Deu again and was again told that he would take care of it. Matlock followed up with Sgt. Deu an hour later and Sgt. Deu indicated that he would shake down Hoskins' cell. Matlock also told Officer Vallarie about the threat and the weapon. Officer Vallarie shook down Hoskins' cell and found the weapon. Even though protocol is that, when someone is found to have a weapon, they go to lockup, Hoskins was left in the dorm. The next day, Hoskins asked Matlock if he told on him, and then proceeded to tell staff that Matlock must have planted the weapon on him. The following day, April 18, 2019, Matlock and Hoskins had multiple verbal altercations. That night, Matlock was awoken to Hoskins and another offender that claimed to be a high-ranking member of the Dirty White Boys' gang. Hoskins and the other offender then told Matlock word-for-word

what he had told Officer Vallarie. They indicated that Officer Vallarie had told a group of black prisoners and eight members of the Dirty White Boys that Matlock reported that Hoskins had a weapon. Matlock was told that he had to leave the dorm or he would be beaten daily because Matlock had snitched on a high-ranking member of the Dirty White Boys. Matlock was beaten on the head, arms, ribs and legs, but the assailants deliberately avoided leaving marks on his face. Matlock's ear was bleeding, and his ribs hurt. He was told to go to his cell and, in the morning, to leave the dorm. Matlock was told not to say anything about the Dirty White Boys or Officer Vallarie or he might go to chow and leave in an ambulance or a hearse. For clarification, it appears that this alleged altercation is unrelated to Matlock's past issues with members of the Vice Lord gang.

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. "[I]n order to state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). The complaint states a plausible Eighth Amendment claim for failure to protect against Sgt. Deu and Officer Vallarie in their individual capacities.

Matlock believes that Sgt. Deu took no action because he is Porter's friend and Matlock had filed complaints about Porter. While these allegations are sparse, Matlock

will be permitted to proceed on a retaliation claim against Sgt. Deu in his individual capacities for nominal, compensatory, and punitive damages, and in his official capacity for injunctive relief.

In the morning, Matlock found Sgt. Deu, who asked if the weapon and been reported to anyone else and if it had been removed. Matlock told Sgt. Deu what occurred the night before. He told Matlock to return to his cell and Sgt. Deu would call Matlock out. About 45 minutes later, Sgt. Deu called Matlock to the squad room and took pictures. He asked Matlock if he wanted medical attention. Matlock indicated that he did, and he filled out a request for protective custody. Matlock was sent to urgent care for treatment, but he was denied treatment and sent back to the squad room.[4] He was assigned to a new doom – this was an "open dorm" and Matlock believes the housing arrangement conflicts with the prior recommendation of a mental health worker that he be placed in a two-man cell. A group of officers, including Lt. Holleran, Sgt. Espisito, and Sgt. Deu surrounded Matlock. Lt. Holleran aimed a can of pepper spray at Matlock's face. When he looked around for cameras, Lt. Holleran and Sgt. Espisito laughed and indicated that there were no cameras in the area. Sgt. Espisito threw Matlock against the wall and yelled that Matlock "would do what the fuck he was told and he would go where the fuck they told him and live where the fuck they said or they would put him in cuffs and drag his ass to eight dorm dayroom and tell them that Matlock was a [illegible] snitch ass check in." (*Id* at 11.) Matlock expressed

---

[4] Matlock does not allege that any of the defendants named in this action were responsible for denying him medical care.

8

concern about members of the Dirty White Boys in the new dorm, but he was told that there were no members of that gang in the new dorm and that he was going to the dorm one way or another. The "core requirement" for an excessive force claim is that the defendant "used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm." *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009) (citation omitted). Several factors guide the inquiry of whether an officer's use of force was legitimate or malicious, including the need for an application of force, the amount of force used, and the extent of the injury suffered by the prisoner. *Id.* Additional fact finding may demonstrate that force was used against Matlock in a good-faith effort to maintain or restore discipline, but giving Matlock the inferences to which he is entitled at this stage of the case, he has stated a claim of excessive force against Sgt. Espisito based on the April 19, 2019, incident.

Matlock does not allege that Lt. Holleran or Sgt. Deu used excessive force, but he may be alleging that they failed to intervene. State actors "who have a realistic opportunity to step forward and prevent a fellow [state actor] from violating a plaintiff's right through the use of excessive force but fail to do so" may be held liable. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir.2000) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Here, it can be plausibly inferred that Lt. Holleran and Sgt. Deu were present for the entire altercation between Matlock and Officer Espisito, but the incident described was so brief that it cannot be plausibly inferred that it lasted sufficiently long for either officer to have an opportunity to take action to stop the attack. Therefore, Matlock has not stated a claim for failure to intervene against Lt. Holleran or Sgt. Deu.

In the course of the transfer, several items belonging to Matlock were stolen. Matlock alleges that Officer Harvest allowed the theft. Officer Harvest is not named as a defendant in the third amended complaint, but even if he were, Matlock could not proceed on a claim based on the theft. Though the Fourteenth Amendment provides that state officials shall not "deprive any person of life, liberty, or property, without due process of law," a state tort claims act that provides a method by which a person can seek reimbursement for the negligent loss or intentional deprivation of property meets the requirements of the due process clause by providing due process of law. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post deprivation remedy."). Indiana's tort claims act (INDIANA CODE § 34-13-3-1 *et seq.*) and other laws provide for state judicial review of property losses caused by government employees, and they provide an adequate post-deprivation remedy to redress state officials' accidental or intentional deprivation of a person's property. *See Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) ("Wynn has an adequate post-deprivation remedy in the Indiana Tort Claims Act, and no more process was due.") Therefore, the allegations regarding theft of property do not state a claim.

Matlock was housed in the new dorm for five days, and then, after Matlock wrote Warden Sevier and Matlock's daughter called the facility, Matlock was moved to segregation. While housed in segregation, Matlock does not enjoy telephone privileges, outside recreation, or hot food. He believes he was moved to segregation by Warden

Sevier in retaliation for filing complaints, grievances and lawsuit. Here, Matlock's allegations are rather speculative, and further inquiry may demonstrate that he was placed in segregation for his own safety rather than out of retaliatory motive, but Matlock will nonetheless be permitted to proceed on this retaliation claim against Warden Sevier in his individual capacity for nominal, compensatory, and punitive damages, and in his official capacity for injunctive relief.

To the extent that Matlock is alleging that Warden Sevier should be held liable for failing to protect him, Matlock has not stated a claim for monetary damages. While Matlock's allegations are troubling, there is no indication that Warden Sevier was made aware of the threat that Hoskins made against Matlock on April 16, 2019, and then failed to take action that would have prevented Matlock's attack on April 18, 2019. Warden Sevier may have known that Matlock was generally having trouble with staff and prisoners alike, but that is not the same as knowing of a specific and credible threat of harm. Without knowledge of a specific and credible threat, Warden Sevier is not liable for failure to protect. As to the earlier incidents, as already explained to Matlock, fear of an attack that does not occur does not state a claim for monetary damages. *See Doe v. Welborn*, 110 F.3d 520, 523–24 (7th Cir. 1997)("An allegation that prison officials exposed a prisoner to a risk of violence at the hands of other inmates does not implicate the Eighth Amendment's Cruel and Unusual Punishments Clause."(internal quotation marks and citation omitted)). Furthermore, "'no prisoner is entitled to insist that one employee do another's job,' and the division of labor is critical to the efficient functioning of the organization." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir.

2017)(quoting *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). As the Seventh Circuit explained in *Burks*:

> The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under §1983 for not being ombudsmen. [The] view that everyone who knows about a prisoner's problem must pay damages implies that [a prisoner] could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Likewise, Matlock cannot hold Warden Sevier liable for the fear and mental suffering he has experienced merely because Warden Sevier knew about Matlock's allegations. Matlock will, however, be permitted to proceed against Warden Sevier in his official capacity to require that Warden Sevier provide Matlock with adequate protection as required by the Constitution. It is noted, however, that Warden Sevier appears to have done all that the constitution requires by placing Matlock in solitary confinement,[5] despite Matlock's dissatisfaction with this solution to securing his safety.[6]

For these reasons, the court:

---

[5] While in solitary confinement, neither members of the Vice Lords nor members of the Dirty White Boys pose a threat to Matlock.

[6] The Seventh Circuit has found a very limited or nonexistent liberty interest in avoiding non-disciplinary segregation of short duration (i.e. six months or less) for administrative, protective, or investigative purposes. *Townsend v. Fuchs,* 522 F.3d 765, 771 (7th Cir. 2008)(prisoner segregation term of 59 days).

(1) GRANTS Barry Wade Matlock's motion for leave to amend his complaint (ECF 48);

(2) DIRECTS the Clerk to file Barry Wade Matlock's third amended complaint (ECF 48-1);

(3) GRANTS Barry Wade Matlock leave to proceed against Sgt. Vernica Porter, Mr. Sonnenberg, Warden Sevier, Sgt. Collier, Sgt. Flakes, Lt. Yancey, Sgt. Motshagen, Sgt. Franklin, Patrick Krueger, Rob Wright, Sgt. Deu in their official capacities for injunctive relief to cease retaliating against him for exercising his First Amendment rights;

(4) GRANTS Barry Wade Matlock leave to proceed against Sgt. Vernica Porter, Mr. Sonnenberg, Warden Sevier, Sgt. Collier, Sgt. Flakes, Lt. Yancey, Sgt. Motshagen, Sgt. Franklin, Patrick Krueger, Rob Wright, and Sgt. Deu in their individual capacities for nominal, compensatory, and punitive damages for retaliating against him for exercising his First Amendment rights;

(5) GRANTS Barry Wade Matlock leave to proceed against Sgt. Deu and Officer Vallarie in their individual capacities for nominal, compensatory, and punitive damages for failing to protect him on April 18, 2019, in violation of the Eighth Amendment;

(6) GRANTS Barry Wade Matlock leave to proceed against Sgt. Espisito in his individual capacity for nominal, compensatory, and punitive damages for using excessive force against him on April 19, 2019, in violation of the Eighth Amendment;

(7) GRANTS Barry Wade Matlock leave to proceed against Warden Sevier in his official capacity for injunctive relief to provide adequate protection from members of the

prison staff and inmates that have threatened him, as required by the Eighth Amendment;

(8) DISMISSES all other claims pursuant to 28 U.S.C. § 1915A;

(9) DISMISSES Lt. Holleran pursuant to 28 U.S.C. § 1915A;

(10) DIRECTS Warden Sevier to file an affidavit or declaration with the court within seven days of releasing Barry Wade Matlock from solitary confinement or by October 21, 2019, whichever comes first, explaining how Barry Wade Matlock is being housed so that he is not in imminent danger of serious physical injury;

(11) DIRECTS the clerk and the United States Marshals Service to issue and serve process on Rob Wright, Sgt. Deu, Officer Vallarie, and Sgt. Espisito at the Indiana Department of Correction with a copy of this order and the third amended complaint (ECF 48-1) as required by 28 U.S.C. § 1915(d); and

(12) ORDERS, pursuant to 42 U.S.C. §1997e(g)(2), that Sgt. Vernica Porter, Mr. Sonnenberg, Warden Sevier, Sgt. Collier, Sgt. Flakes, Lt. Yancey, Sgt. Motshagen, and Sgt. Franklin, Patrick Krueger, Rob Wright, Sgt. Deu, Officer Vallarie, and Sgt. Espisito respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on May 22, 2019

/s/ JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT